UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

COREY D. HOLDER, as Personal
Representative of the Estate of
Elizabeth Holder, a deceased
minor child,

      Plaintiff,

v.                    Case No. 8:14-cv-3052-T-33TGW

BOB GUALTIERI, in his official
capacity as Sheriff of Pinellas
County, Florida,

      Defendant.

_____/

## **ORDER**

This cause is before the Court pursuant to Defendant's Motion for Summary Judgment, filed on February 16, 2016. (Doc. # 73). On February 26, 2016, Plaintiff filed a response in opposition (Doc. # 74), and Defendant filed a reply on March 11, 2016 (Doc. # 75). For the reasons that follow, the Motion is granted in part and denied in part.

## I.  **Background**

This action arises from the tragic death of five-year-old Elizabeth Holder while she was placed in emergency shelter care. Elizabeth's father, Corey Holder, as the personal representative of her estate, sues Bob Gualtieri, in his official capacity as Sheriff of Pinellas County, Florida ("the Sheriff"). Holder alleges that the Sheriff's employees routinely failed to ensure that children removed from their homes received a health care assessment within 72 hours, as required by state law.

Elizabeth did not receive a health care assessment before she died on January 19, 2013, her eighth day in shelter care. Although the parties dispute the exact cause of Elizabeth's death, the coroner determined that a contributing condition was tonsilitis. Holder maintains that had his daughter received a timely health care assessment, any competent medical practitioner would have discovered her condition and Elizabeth's death could have been prevented.

**A. Elizabeth's removal**

On Friday, January 11, 2013, Deputy Justin Fineberg was dispatched to investigate a report of possible child neglect. (Doc. # 73-6 at ¶¶ 2, 4). After interviewing Elizabeth's mother, Stephanie Judah, Elizabeth's grandmother, Denette Allali, and two neighbors, Fineberg called the Florida Abuse Hotline to report that Elizabeth and her sister were not being properly supervised. (Id. at ¶¶ 8-9). Fineberg arrested Judah for child neglect. (Id. at ¶ 11).

Brett Edwards, a child protection investigator, was assigned to the case. (Doc. # 73-7 at ¶¶ 2, 5). Edwards worked for the Sheriff's Child Protective Investigation Division ("CPID"), which was established in 1999 for the sole purpose of performing child protective investigations in Pinellas County, Florida. (Doc. # 73-5 at ¶¶ 4-5).

During his interaction with Elizabeth, Edwards did not observe any injury, illness, or medical condition, although

Allali informed Edwards that Elizabeth was lactose intolerant. (Doc. # 73-7 at ¶ 6; Doc. # 73-8 at 8-9).  After consulting with the State Attorney's Office, Edwards removed Elizabeth and her sister from the home. (Doc. # 73-7 at ¶ 7).  Edwards transported the children until emergency shelter care could be obtained.  (<u>Id.</u>).

The following day, Edwards completed a "Family Support Request Form," which, among other things, requested a health care assessment for Elizabeth.  (<u>Id.</u> at ¶ 9 & Exh. B). Edwards submitted the form for assignment to a family support worker.  (<u>Id.</u> at ¶ 10).

Pamela Wilson was Elizabeth's family support worker. (Doc. # 73-9 at 5, 8-9).  In order to schedule the health care assessment, Wilson called Elizabeth's primary care provider, but they did not return Wilson's call. (<u>Id.</u> at 9).  The next day, Wilson personally went to the provider's office and scheduled a physical for the first appointment available. Although that appointment was more than 72 hours out, Wilson understood that this was consistent with practices in her division.  (<u>Id.</u>).  In particular, Wilson understood that the appointment only had to be scheduled within 72 hours, not that the health care assessment had to be completed within 72 hours.  (<u>Id.</u> at 8, 10).

According to Elizabeth's father, Elizabeth was "a hundred percent" healthy in January of 2013.  (Doc. # 73-10 at 19).

3

Likewise, Allali was not aware of any medical problems. (Doc. # 73-13 at 14). Due to Elizabeth's lactose intolerance, she continued to wear diapers at age five. (Doc. # 73-10 at at 48). Elizabeth also drooled off and on, but Holder did not seek treatment for that condition. (Id. at 20-21).

**B. Elizabeth's placement and death**

Elizabeth was placed in the care of Rosemarie Uva, a state-approved shelter caregiver, either in the late hours of January 11, 2013, or in the early morning hours of January 12, 2013. (Doc. # 73-14 at ¶¶ 2, 4). Uva was not advised of any medical condition or illness at the time of placement. (Id. at ¶¶ 4-5). Uva did observe that Elizabeth drooled excessively and spoke with a slight lisp. (Id. at ¶ 6). Both conditions improved with a change in Elizabeth's diet. (Id.). Uva also noticed that Elizabeth wore pull-up diapers and was initially reluctant to use the toilet on her own, but Elizabeth improved every day with fewer accidents. (Id. at ¶ 7). Starting on Monday, January 14, 2013, Elizabeth went to Uva's daycare each day, which she seemed to enjoy. (Id. at ¶ 9). Elizabeth did not complain of feeling unwell, and her appetite seemed normal in comparison to Uva's own children and other children in the daycare. (Id. at ¶ 10).

On Wednesday, January 16, 2013, Elizabeth's fifth day in shelter care, she had supervised visitation with her father and grandmother. (Doc. # 73-13 at 36). Holder and Allali did

4

not observe any condition requiring medical attention. (Id. at 37; Doc. # 73-12 at ¶ 39; Doc. # 73-10 at 66). Allali did notice that Elizabeth was withdrawn, but she attributed that to Elizabeth not liking where she was staying. (Doc. # 73-13 at 40). Elizabeth complained to Holder that the cornrows in her hair were too tight, and she said, "Daddy, please don't make me go back to that house." (Doc. # 73-10 at 65, 70).

On Saturday evening, January 18, 2013, Uva dropped Elizabeth off with a babysitter, Crystal Roberts, where she stayed overnight. (Doc. # 73-14 at ¶ 11). Around 4:00 p.m. the following day, January 19, 2013, Elizabeth was singing along to the introduction of a television program when she grabbed her head and started to scream, "It hurts! It hurts! Make it stop!" (Doc. # 73-3 at 98). Roberts thought that Elizabeth was suffering from a seizure and called 911. (Id.). Paramedics transported Elizabeth to the hospital, where she suffered cardiac arrest upon arrival. (Id. at 99; Doc. # 73-12 at 26). Elizabeth was pronounced dead at 4:58 p.m. (Doc. # 73-12 at 26).

On January 20, 2013, the Pinellas County Medical Examiner performed an autopsy. (Doc. # 73-12 at ¶ 47 & Exh. C). The Autopsy Report listed the "Cause of Death" as endomyocardial fibrosis, and the "Contributory Condition" as tonsillitis. (Doc. # 73-12 at 12).

Holder's expert, Edward Willey, M.D., testified that it was more likely than not that Elizabeth's cause of death was acute hypoxia, an exacerbation of chronic hypoxia due to chronic and acute airway obstruction associated with adenotonsillar lymphoid hyperplasia and asthma.[1] (Doc. # 73-15 at 56). Willey opined that, had Elizabeth seen a competent medical practitioner, even the most perfunctory examination would have disclosed her condition. (Id. at 58-59).

## C. The Sheriff's investigation

Sergeant Scott Matthews was assigned to investigate any policy violations involved in Elizabeth's case. (Doc. # 74-2 at 5-6). At the time of Elizabeth's placement in emergency shelter care, the Florida Administrative Code provided: "An initial health care assessment by a licensed health care professional will be completed for every child entering emergency shelter care within seventy-two (72) hours of removal." Fla. Admin. Code. § 65C-29.008 (2012). Consistent with that mandate, the Sheriff's standard operating procedure stated:

> Children who have been placed in licensed shelter must have a medical screening within 72 hours of

---

[1] By separate motion, the Sheriff seeks to exclude Willey's testimony pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). (Doc. # 67). Because Willey's testimony is not material to the issues currently before the Court, it is included for background purposes only.

> removal from home.  This screening is to detect any
> injury, illness, communicable diseases or need for
> immunization (this does not replace the examination
> for injury by CPT).  CPID has agreed to be
> responsible for seeing this medical screening is
> completed for children who are placed in licensed
> shelter care.

(Doc. # 73-3 at 181).

Sergeant Matthews determined that the Sheriff's standard operating procedure was inconsistent with an Interagency Working Agreement between the Sheriff and Eckerd Community Alternatives, Inc. ("Eckerd"). (Doc. # 74-2 at 10-11).  As discussed in more detail below, Eckerd provides foster care and related services in Pinellas County.  The Working Agreement between the two entities required the Sheriff to "initiate" the health care assessment within 72 hours of removal, and it also made performance of the assessments contingent on funding.  (Doc. # 73-3 at 201).  Sergeant Matthews ultimately concluded that the Sheriff's standard operating procedure was not being followed as written.  (Doc. # 74-2 at 13).

According to Captain Timothy Pupke, the Sheriff took 674 children into custody in 2012, the year before Elizabeth's death.  (Doc. # 73-4 at 5, 10).  Of those children, 230 children were placed in emergency shelter care.  (Id. at 10).  The Sheriff could not determine whether 97 of the 230 children had, or had not, received a health care assessment.  (Id. at 11).  The Sheriff had information for only 133 children.  The

7

Sheriff maintains that eight of those children did not meet the requirement for a health care assessment because they involved transfers between counties or previously opened cases. (Id.) Of the remaining 125 children, 75 children received the health care assessment in 72 hours and 50 children did not receive a timely health care assessment. (Id. at 7).

Before Elizabeth's death, the Sheriff was not aware that the health care assessments were not being timely performed. (Doc. # 73-2 at 21). The Sheriff testified that "we had plenty of money, the funding was there for it, it was never an issue."[2] (Id.). After Elizabeth's death, the Sheriff made sure that "one hundred percent" of children received an assessment within 72 hours, directing his staff to use urgent care centers or walk-in clinics if necessary. (Id. at 21-22, 41).

Captain Pupke avers that no children, including the 50 children removed in 2012 who did not receive a timely health care assessment, are known to have died, been injured, or suffered illness or pain as a result of not having a timely assessment. (Doc. # 73-5 at ¶ 8).

---

[2] Holder asserts that, in 2007, an administrator in the Sheriff's Office sent a department-wide email stating: "Until further notice, we will not be taking children for their health screenings. CPT is stating that they can no longer afford to do them." (Doc. # 74-3 at 7, 21, 51).

## II.  __Legal Standard__

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  __Anderson v. Liberty Lobby, Inc.__, 477 U.S. 242, 247–48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  __Mize v. Jefferson City Bd. of Educ.__, 93 F.3d 739, 742 (11th Cir. 1996) (citing __Hairston v. Gainesville Sun Publ'g Co.__, 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law. __Allen v. Tyson Foods, Inc.__, 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  __Hickson Corp. v. N. Crossarm Co., Inc.__, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing __Celotex Corp. v. Catrett__, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions,

answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593–94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. <u>Analysis</u>

In the Second Amended Complaint, Holder asserts the following claims: a claim pursuant to 42 U.S.C. § 1983 for violation of Elizabeth's substantive due process rights (Count

I), a claim pursuant to 42 U.S.C. § 1983 for violation of Elizabeth's procedural due process rights (Count II), and a claim pursuant to Florida's Wrongful Death Act, Fla. Stat. §§ 768.16, et seq. (Count III). (Doc. # 32). In the instant Motion, the Sheriff argues that he is entitled to Eleventh Amendment immunity from suit in federal court. (Doc. # 73 at 23-24). Alternatively, the Sheriff requests summary judgment on each of Holder's claims. (Id. at 12-23, 25-26).

For the reasons set forth below, the Court finds that the Sheriff has not demonstrated that he was acting as an "arm of the state" as required to claim Eleventh Amendment immunity. However, the Sheriff is entitled to summary judgment in his favor on Holder's Section 1983 claims. With the federal claims resolved, the Court declines to exercise supplemental jurisdiction over Holder's remaining state-law claim.

**A. Eleventh Amendment immunity**

Absent a waiver or a valid Congressional override, the Eleventh Amendment bars damages suits against a state in federal court. Odebrecht Constr., Inc. v. Sec., Fla. Dep't of Transp., 715 F.3d 1268, 1289 (11th Cir. 2013). Eleventh Amendment immunity extends beyond the state itself "to state officers and entities when they act as an 'arm of the state.'" Lightfoot v. Henry Cty. Sch. Dist., 771 F.3d 764, 768 (11th Cir. 2014) (internal quotation marks omitted). The immunity

does not apply "to counties, municipal corporations, or similar political subdivisions of the state." Id.

The Sheriff recognizes that the Eleventh Circuit has "repeatedly held that Florida's sheriffs are not arms of the state" and are therefore not entitled to Eleventh Amendment immunity. Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs, 405 F.3d 1298, 1304 (11th Cir. 2005). In this case, however, the Sheriff argues that he was performing child protective investigative functions that are typically performed by the Department of Children and Families (DCF). As a result, the Sheriff maintains that he is entitled to claim the same immunity afforded to DCF. See, e.g., Gamble v. Fla. Dep't of Health & Rehab. Servs., 779 F.2d 1509, 1511 (11th Cir. 1986) (affirming the dismissal of a complaint against DCF's predecessor, the Florida Department of Health and Rehabilitative Services, pursuant to Eleventh Amendment immunity).

The Court first reviews the Florida statutes that authorize and govern the Sheriff's performance of child protective investigations. The Court next reviews the source of the Sheriff's funding, including relevant provisions of the grant agreement between the Sheriff and DCF. With that background, the Court assesses whether the Sheriff was acting as an "arm of the state" during the events at issue.

12

### 1. Applicable state law

In 1998, the Florida Legislature required DCF to "transfer all responsibility for child protective investigations for Pinellas County, Manatee County, and Pasco County to the sheriff of that county in which the child abuse, neglect, or abandonment is alleged to have occurred." Fla. Stat. § 39.3065(1). During the initial year of the program, DCF retained "the responsibility for the performance of all child protective investigations." Fla. Stat. § 39.3065(2). By fiscal year 1999-2000, the Sheriff was required to "assume the entire responsibility for such services, as provided in subsection (3)," unless the Legislature acted to block the transfer. Id.

Under subsection (3), the Legislature required the sheriffs to "operate, at a minimum, in accordance with the performance standards and outcome measures established by the Legislature for protective investigations conducted by [DCF]." Fla. Stat. § 39.3065(3)(b). In addition, the Legislature required each person performing child protective investigations to "complete, at a minimum, the training provided to and required of protective investigators employed by [DCF]." Id.

Child protective investigations are governed by Part III of Chapter 39 of the Florida Statutes. See Fla. Stat.

13

§§ 39.301-39.308.   Section 39.301 specifies that for each report accepted for investigation, "the department or the sheriff providing child protective investigative services under s. 39.3065, shall perform the following child protective investigation activities to determine child safety."  Fla. Stat. § 39.301(9)(a).  At the time of Elizabeth's removal, the activities listed in Section 39.301(9)(a) included face-to-face interviews, an assessment of the residence, and completion of a standardized safety assessment.  Id.  Section 39.301 further required DCF's training program to include several competencies, and it required DCF to incorporate specific components into its quality assurance program.  Fla. Stat. § 39.301(10)-(11).

The procedures for "Taking Children into Custody and Shelter Hearings" are detailed in Part IV of Chapter 39 of the Florida Statutes.  Pursuant to Section 39.402, "[a] child may not be held in a shelter longer than 24 hours unless an order so directing is entered by the court after a shelter hearing."  Fla. Stat. § 39.402(8)(a).  "In the interval until the shelter hearing is held, the decision to place the child in a shelter or release the child from a shelter lies with the protective investigator."  Id.

With respect to medical treatment for a child removed from home, Section 39.407 provides, in relevant part:

> When any child is removed from the home and
> maintained in an out-of-home placement, the
> department is authorized to have a medical
> screening performed on the child without
> authorization from the court and without consent
> from a parent or legal custodian. Such medical
> screening shall be performed by a licensed health
> care professional and shall be to examine the child
> for injury, illness, and communicable diseases and
> to determine the need for immunization.

Fla. Stat. § 39.407(1). It is pursuant to this statutory authority that the Florida Administrative Code required an "initial health care assessment by a licensed health care professional" to be completed within 72 hours for all children entering emergency shelter care. Fla. Admin. Code § 65C-29.008 (2012).[3]

The Florida Administrative Code does not specify who is responsible for completing the health care assessment. <u>See id.</u> Florida privatizes foster care and related services through contracts with "community-based agencies" – in this case, Eckerd. Fla. Stat. § 409.1671 (1999). In practice, "[t]here is variation across the state in deciding the point at which the lead agency assumes responsibility for the case management of a child welfare case, with varying degrees of cooperation and overlap between [child protective

---

[3] On December 31, 2014, Section 65C-29.008 was amended to require a health care assessment for a child placed with a relative, non-relative, or in licensed care within five working days of the removal. If a child "appears to be sick or in physical discomfort," an examination is required within 24 hours. Fla. Admin. Code § 65C-29.008 (2015).

investigators] and lead agencies." Florida Staff Analysis, S.B. 1666 (Apr. 24, 2014). As discussed below, the Sheriff and Eckerd agreed that the Sheriff would have primary responsibility for completing the health care assessments.

## 2. Funding and grant provisions

The Sheriff receives funds for child protective investigations through an annual appropriation from the Legislature to DCF, which, in turn, awards a grant to the Sheriff. Fla. Stat. § 39.3065(c). During the events at issue, the Sheriff was operating pursuant to a Grant Agreement between DCF and the Sheriff, executed on June 29, 2010. (Doc. # 73-3 at 4, 18). The Grant Agreement provided $10,225,022.00 in funding for the 2012-2013 fiscal year, an amount which included both state and federal funds. (Id. at 6, 70).

Pursuant to the Grant Agreement, the Sheriff was required to "provide child protective investigations for all reports referred by Florida Abuse Hotline within Pinellas County in accordance with all applicable federal laws, statute statutes, and Attachment I." (Id. at 7). Similar to the language in Fla. Stat. § 39.3065, the Grant Agreement required the Sheriff to "operate, at a minium, in accordance with performance standards and outcome measures for child protective investigations conducted by the Grantor and outlined in Attachment I." (Id. at 8).

16

The Grant Agreement imposed various financial, reporting, and technical requirements. For instance, it required the Sheriff to maintain and retain financial records, to participate in audits, and to return overpayments. (Id. at 8-9). It required the Sheriff to notify DCF of significant injuries to children in the Sheriff's custody and to indemnify DCF to the extent permitted by law. (Id.). The Sheriff was required to safeguard information and to comply with civil rights and other federal statutes. (Id. at 9, 11-12). The Grant Agreement further stated that DCF and the state "maintain substantial control over the performance of this Grant Agreement through specific requirements of Chapter 39, F.S.," and it allowed the Sheriff, to the extent permitted by law, to "assert any privileges and immunities which are available as a result of the Grantee performing the state functions required by Chapter 39, F.S." (Id. at 13).

In other areas, the Grant Agreement preserved the Sheriff's traditional autonomy. The Sheriff was authorized to "develop specific policies and operating procedures to implement applicable federal laws and state statutes regarding child protective investigations," and could, at his discretion, adopt "all or parts" of DCF's current procedures. (Id. at 22). The Sheriff was directed to use his "own policies and procedures, including internal

17

affairs/professional compliance procedures, and be responsible for the review of complaints against employees." (Id. at 10). The Sheriff was permitted, with prior written notice to DCF, to "subcontract with law enforcement officials or private agencies to conduct investigations related to neglect reports only." (Id. at 9).  The Grant Agreement left staffing levels and personnel qualifications to the Sheriff's discretion, and it described the Sheriff as "an independent contractor." (Id. at 12, 23).  Although quarterly and annual expenditure reports were required, the Grant Agreement did not specify how the Sheriff would allocate grant funds.  (Id. at 23-24).  The Sheriff testified that he had "some discretion," just "not the discretion that I have with everything else within the agency." (Doc. # 73-2  at 14).

For children in need of temporary care, the Grant Agreement provided that the Sheriff was responsible as follows:

> In reports where it is determined that a child is in need of temporary substitute care, the Grantee shall be responsible for the delivery of the child to the Grantor or [the community-based agency]. After such delivery, the Grantee shall have no further responsibility for providing transportation for the child except for transportation directly related to the conduct of the investigation unless agreed to in a separate document with the [community-based agency].

(Doc. # 73-3 at 21-22).  The Grant Agreement required the Sheriff and the community-based agency to use and revise a

18

"Working Agreement," which "shall describe procedures for placement of children taken into custody" and other "joint operating procedures." (Id. at 22).

The Working Agreement between the Sheriff and Eckerd included a section governing "Medical Attention/Health Screenings," which provided in relevant part:

> Contingent upon the availability of funding, [the Sheriff] will be responsible for initiating the initial child health screenings of children entering licensed care within 72 hours from removal. If a removal occurs on an open [Eckerd] case and a screening is needed, the screening will be the responsibility of the case management agencies. When a child is being seen for a CPT medical exam, the health screening will be completed at that time.

(Id. at 201). As discussed above, the Sheriff's own standard operating procedure confirmed that he "agreed to be responsible for seeing this medical screening is completed for children who are placed in licensed shelter care." (Id. at 181). By contrast, an earlier version of that procedure provided that: "Community-based Care has primary responsibility for ensuring this screening is done in Pinellas County, although [the Sheriff] has assisted in certain cases." (Id. at 118).

### 3. Eleventh Amendment factors

In assessing whether an entity may be considered an "arm of the state," the Eleventh Circuit considers four factors: (1) how state law defines the entity, (2) what degree of

control the state maintains over the entity, (3) the source of the entity's funds, and (4) who is responsible for judgments against the entity.  Manders v. Lee, 338 F.3d 1304, 1309 (11th Cir. 2003) (en banc).  The four factors "must be assessed in light of the particular function in which the defendant was engaged" during the events at issue.  Id. at 1308.  The parties agree that the particular function in this case is the Sheriff's failure to submit Elizabeth to a timely health care assessment.

### (a) How state law defines the entity

The Eleventh Circuit has held that "Florida's constitution and case law establish overwhelmingly that Florida law defines sheriffs as county officials."  Abusaid, 405 F.3d at 1306.  Florida's constitution labels sheriffs "county officers," Florida case law holds that sheriffs are county officials, sheriffs are elected by the county, and the office may be abolished by the county.  Id. at 1305-06.  As a result, the first factor has typically been held to weigh "heavily against assigning arm of the state status to a Florida sheriff."  Id. at 1305; Hufford v. Rodgers, 912 F.2d 1338, 1341 (11th Cir. 1990).

With respect to the particular function at issue in this case, the relevant provisions of Florida law and the Grant Agreement do not alter the essentially local and autonomous

character of the Sheriff's office.  Section 39.3065 effected a transfer of "all responsibility" and the "entire responsibility" for child protective investigations to the Sheriff. Fla. Stat. § 39.3065(1)-(2). Consistent with this blanket transfer of responsibility, the Grant Agreement described the Sheriff as "an independent contractor," it preserved the Sheriff's discretion with respect to his employees and allocation of funds, and it allowed the Sheriff to develop his own policies for child protective investigations.  See Rosario v. Am. Corrective Counseling Servs., Inc., 506 F.3d 1039, 1044-45 (11th Cir. 2007) (in assessing Eleventh Amendment immunity, emphasizing that the defendant was characterized as an "independent contractor" and not an agent); cf. Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp., 208 F.3d 1308, 1311 (11th Cir. 2000) (holding that a private corporation was an agent of the state, in part, where the state retained final decision-making authority); Powell v. Dep't of Human Res. of State of Ga., 918 F. Supp. 1575, 1578-79 (S.D. Ga. 1996) (holding that county-based child-welfare agencies were entitled to Eleventh Amendment immunity where they were incorporated to administer child welfare programs more efficiently).  Notably, that discretion is statutorily-mandated by Fla. Stat. § 30.53, which provides: "The independence of the sheriffs shall be preserved

21

concerning the purchase of supplies and equipment, selection of personnel, and the hiring, firing, and setting of salaries of such personnel."

The Court notes that, in addition to considering how an entity is defined by state law or by contract, the Eleventh Circuit has also considered whether a sheriff is wearing a "state hat" and whether the sheriff's authority is "derived from the state." Manders, 338 F.3d at 1319 & n.35; Pellitteri v. Prine, 776 F.3d 777, 780 (11th Cir. 2015). Here, as a general matter, the Sheriff's authority to perform child protective investigations is derived from the Legislature pursuant to Fla. Stat. § 39.3065. As discussed in more detail in the next section, however, the Sheriff's performance of the particular function at issue – health care assessments – originates not under Florida law or the Grant Agreement, but pursuant to the Working Agreement with Eckerd.

Accordingly, while the Sheriff wears a "state hat" in the sense that he has taken over a traditionally state-run activity, he does so as a local official with the discretion of an independent contractor. Lightfoot, 771 F.3d at 771 (explaining that "it is not sufficient that the School District's powers and duties are derived from state law," where the state imbues the entity with a significant measure of autonomy). On balance, the Court finds that this factor weighs against arm-of-the-state status.

22

**(b) Degree of state control**

The second factor addresses what degree of control the state retains over the function at issue.  <u>Manders</u>, 338 F.3d at 1308.  The Sheriff argues that Section 65C-29.008 of the Florida Administrative Code sets forth the exact manner in which a health care assessment must be accomplished, and that "[t]he Sheriff was not permitted any input into the parameters of scheduling the appointments."  (Doc. # 73 at 23).

The Court is not persuaded that the regulatory mandate of 65C-29.008, standing alone, is sufficient to demonstrate state control over the function at issue.  As the Eleventh Circuit has observed, "[a]lthough state laws of general application govern Florida sheriffs, their guidance does not necessarily transform the sheriff's office into an agency of the state."  <u>Hufford</u>, 912 F.2d at 1341; <u>see</u> <u>also</u> <u>Lightfoot</u>, 771 F.3d at 773 ("[e]stablishing minimum requirements is not sufficient to demonstrate control"); <u>cf.</u> <u>Manders</u>, 338 F.3d at 1321 (explaining that a state law requiring annual training of sheriffs, specifically, was not a law of general application).

Additionally, neither the Legislature nor DCF imposed an "obligation" on the Sheriff to perform the health care assessments, and the state did not otherwise maintain "near-total control over" the health care assessments, in terms of funding, staffing, or reporting requirements.  <u>U.S. ex rel.</u>

Lesinski v. S. Fla. Water Mgmt. Dist., 739 F.3d 598, 604 (11th Cir. 2014). The health care assessments were not mentioned in the Grant Agreement, and the assessments are not included within the statutorily-defined "child protective investigative activities" under Fla. Stat. § 39.301(9)(a). Indeed, the Grant Agreement specifically provided that the Sheriff had no responsibility for transporting a child in need of temporary substitute care after delivering the child to Eckerd. (Doc. # 73-3 at 21-22).

Moreover, the Grant Agreement effectively allowed Eckerd and the Sheriff to decide which entity would perform the health care assessments, by requiring the Sheriff and Eckerd to agree on "procedures for placement of children taken into custody" and to develop "joint operating procedures." (Id. at 22). As evinced by their Working Agreement, the Sheriff had agreed to perform the health care assessments at the time of Elizabeth's removal. (Id. at 118, 201). But the Sheriff's discretion to decline responsibility for that task is illustrated by his previous standard operating procedure, which left the task to Eckerd. (Id. at 118).

Based on the foregoing, it does not appear that the state was attempting to exercise control over the Sheriff for the particular function at issue. Instead, the state was merely attempting to ensure that the necessary services would be

24

provided by either the Sheriff or Eckerd at the local level. See Abusaid, 405 F.3d at 1309. ("In short, the counties retain substantial discretion in determining which county office or official will actually be assigned these duties"). Furthermore, beyond specifying the minimum requirement that a health care assessment be completed within 72 hours by a licensed professional, DCF did not exert control over this function in terms of funding, staffing, or reporting. Lightfoot, 771 F.3d at 773.[4]  The Court therefore finds that this factor weighs against arm-of-the-state status.

### (c) Source of funding

In Florida, a sheriff's regular budget is "funded entirely by county taxes." Abusaid, 405 F.3d at 1310. However, Fla. Stat. § 39.3065 provides that funding for child protective investigations will be identified in the annual appropriation made to DCF, which, in turn, awards grants to the Sheriff. Fla. Stat. § 39.3065(c). The Grant Agreement confirms that "there is no local funding source for child protective investigations." (Doc. # 73-3 at 15).

Holder cites no evidence suggesting that the health care

---

[4] For these same reasons, the Court is not persuaded that the broad statement in the Grant Agreement that the state maintains "substantial control over the performance of this Grant Agreement," evinces the requisite control over the particular function at issue. (Doc. # 73-3 at 13).

assessments are funded by any means other than through grant funds.  Although federal funds are part of the grant award, the fact remains that there is no identified local source of funding.  (Doc. # 73-3 at 6).  The third factor thus weighs in favor of arm-of-the-state status.

### (d) Liability for a judgment

The final factor addresses "whether the state's treasury would be burdened by an adverse verdict."  <u>Abusaid</u>, 405 F.3d at 1312.  The Sheriff asserts that "any judgment resulting from removal would be payable by the money the Legislature gives to the Sheriff via Grant . . . . Such could not come from funding received from Sheriff for performance of police functions."  (Doc. # 73 at 24).  The Sheriff cites no record evidence in support of this statement. (<u>Id.</u>).  In his reply brief, the Sheriff cites his own deposition testimony, but that testimony only indicates that grant funds are maintained separately from the Sheriff's regular budget.  (Doc. # 75 at 9; Doc. # 73-2 at 5-7).  It does not address the controlling question of whether any damages judgment in this case would be paid from the state treasury, if Holder prevails.

The Eleventh Circuit has previously held that this factor "weighs decidedly against arm of the state status" because there is no provision in Florida law suggesting that a judgment against a sheriff would be paid out of the state

treasury.  <u>Abusaid</u>, 405 F.3d at 1312.  Indeed, Florida law authorizes sheriffs to purchase liability insurance to cover "claims arising out of the performance of . . . the duties of his or her deputies or employees." <u>Id.</u>; Fla. Stat. § 30.555; <u>see also</u> <u>Hufford</u>, 912 F.2d at 1342 (noting that sheriff was insured through monies appropriated by the county commission, as part of a self-insurance fund).

The Court notes that it is "presumed in this Circuit that where an entity's budget is submitted to state legislature for approval, the state is responsible for any debts that cannot be paid out of the entity's revenues." <u>Harden v. Adams</u>, 760 F.2d 1158, 1164 (11th Cir. 1985).  Although the Sheriff maintains that he is required to submit expenditure reports to DCF, the Sheriff cites no evidence suggesting that the state retains budget approval, and he does not invoke this presumption.  (Doc. # 73 at 24 & n.48).

As the party claiming Eleventh Amendment immunity and as the party moving for summary judgment, it is the Sheriff's burden to identify specific record evidence demonstrating that he is entitled to judgment as a matter of law.  <u>Hickson Corp.</u>, 357 F.3d at 1260; <u>Miller v. Advantage Behavioral Health Sys.</u>, No. 3:14-CV-45, 2015 WL 6964293, at *2 (M.D. Ga. Nov. 10, 2015).  Rather than discharging his initial burden, the Sheriff improperly attempts to shift the burden to Holder.

(Doc. # 75 at 9).   The Court finds that the fourth factor weighs against arm-of-the-state status.

### 4. Balancing the factors

The majority of the relevant factors weigh against arm-of-the-state status.   In the final calculus, the Court is mindful that the fourth factor was historically the "most salient factor" in the Eleventh Amendment analysis because the impetus for the Eleventh Amendment was "the prevention of federal-court judgments that must be paid out of a State's treasury." Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 48 (1994); Abusaid, 405 F.3d at 1312.   Yet, more recent Supreme Court cases instruct that "the primary function of sovereign immunity is not to protect state treasuries, . . . but to afford the States the dignity and respect due sovereign entities." Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 769 (2002); Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 267 (2011).

On the current record, it does not appear that either concern is jeopardized by denying the Sheriff arm-of-the-state status.   The Sheriff comes forward with no evidence suggesting that a judgment would be paid out of the state treasury.   And, as explained above, the Legislature left intact the Sheriff's local autonomy when it shifted "the entire responsibility" for child protective investigations in Pinellas County to the

Sheriff.   Fla. Stat. § 39.3065(1).   As a result of that blanket transfer of responsibility, it is the Sheriff's dignity – not that of DCF or the state – that is threatened by a lawsuit in federal court.   The Court therefore concludes that the Sheriff is not an "arm of the state" for the particular function at issue, and he is not entitled to Eleventh Amendment immunity.

Accordingly, the Court denies the Sheriff's Motion for Summary Judgment to the extent that the Sheriff claims Eleventh Amendment immunity.

**B. Section 1983 claims**

Section 1983 of the Civil Rights Act of 1871 creates a cause of action for the deprivation of rights, privileges, or immunities secured by the federal Constitution or federal law, by any person acting under color of state law.   42 U.S.C. § 1983; Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998).   To prevail on a claim under Section 1983, a plaintiff must establish that: (1) he has been deprived of a right, privilege, or immunity secured by the Constitution or federal law, and (2) the deprivation occurred under color of state law.   Id.; Butler v. Sheriff of Palm Beach Cty., 685 F.3d 1261, 1265-66 (11th Cir. 2012) ("A defendant acts under color of state law when she deprives the plaintiff of a right through the exercise of authority that she has by virtue of her government office or position.").

29

## 1. Substantive due process

"The substantive component of the Due Process Clause
protects those rights that are 'fundamental,' that is, rights
that are 'implicit in the concept of ordered liberty.'"
McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting
Palko v. Connecticut, 302 U.S. 319, 325 (1937)).  "A finding
that a right merits substantive due process protection means
that the right is protected against certain government actions
regardless of the fairness of the procedures used to implement
them."  Id. (internal quotation marks omitted).  In Count I of
the Second Amended Complaint, Holder alleges that the Sheriff
failed to provide Elizabeth with a prompt medical assessment,
depriving her of the fundamental right to physical safety.
(Doc. # 32 at ¶¶ 37-38).

The Eleventh Circuit has determined that a foster child
has "a constitutional right to be free from unnecessary pain
and a fundamental right to physical safety." Ray v. Foltz,
370 F.3d 1079, 1082 (11th Cir. 2004).  However, only when an
official is "deliberately indifferent to the welfare of the
child will liability be imposed." Id. at 1983.  Deliberate
indifference requires more than negligence; it requires that
the official disregard a risk of harm of which he is actually
aware.  Id.

Because Holder sues the Sheriff in his official capacity,
which is the functional equivalent of a suit against Pinellas

30

County, Holder must demonstrate that the municipality, itself, was the "moving force" behind any constitutional violation. See Vineyard v. County of Murray, 990 F.2d 1207, 1210 n.3 (11th Cir. 1993); City of Canton v. Harris, 489 U.S. 378, 389 (1989) (internal quotation marks omitted). Municipal liablity may be predicated on an unlawful "custom," which is "a persistent and widespread practice" with the force of law. Goebert v. Lee County, 510 F.3d 1312, 1332 (11th Cir. 2007) (internal quotation marks omitted). Holder asserts that such an unlawful custom exists in this case because the Sheriff had a widespread practice of failing to provide prompt health care assessments. (Doc. # 32 at ¶¶ 32-34).

Even assuming that Elizabeth, herself, suffered a constitutional violation – which the Sheriff vehemently disputes – Holder has not come forward with sufficient evidence to establish a basis for municipal liability. The record demonstrates that the Sheriff failed to obtain a timely health care assessment for 50 children placed in emergency shelter care in 2012. (Doc. # 73-4 at 7). That failure, standing alone, does not provide a basis for holding the Sheriff liable because "failure to follow procedures does not, by itself, rise to the level of deliberate indifference." Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000). Holder identifies no additional evidence that would support an inference that the Sheriff's failure to submit children to a

prompt health care assessment negatively affected another child's medical condition or otherwise violated a child's fundamental right to physical safety. See McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004) (observing that the plaintiff could not "point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition"); Craig v. Floyd County, 643 F.3d 1306, 1312 (11th Cir. 2011) ("that evidence tells us nothing about whether an alleged policy or custom of Georgia Correctional has led to more than one alleged constitutional violation").

To the contrary, Captain Pupke avers that no child, including the 50 children removed from custody who did not receive an assessment within 72 hours, are known to have died, been injured, or suffered illness or pain as a result of not receiving a timely assessment. (Doc. # 73-5 at ¶ 8). Additionally, after Elizabeth's death, the Sheriff maintains that he took corrective action by ensuring that one hundred percent of children received a health care assessment within 72 hours of removal. (Doc. # 73-2 at 21-22, 41); see West v. Tillman, 496 F.3d 1321, 1330 (11th Cir. 2007) (explaining that the supervisory defendants did not exhibit deliberate indifference because they attempted to take corrective measures).

32

Based on the foregoing, Holder fails to demonstrate any colorable basis for holding the Sheriff liable on the substantive due process claim.   The Sheriff's Motion for Summary Judgment is therefore granted on Count I of the Second Amended Complaint.

### 2. Procedural due process

In Count II, Holder alleges that the Sheriff deprived Elizabeth of her right under state law to a prompt health care assessment.   (Doc. # 32 at ¶¶ 47-51, 54).   A plaintiff asserting a violation of the procedural component of the Due Process Clause must demonstrate: (1) a deprivation of a constitutionally-protected liberty or property interest, (2) state action, and (3) constitutionally-inadequate process. Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994).   In contrast to a substantive due process claim, a procedural due process claim may be based on a state-created property or liberty interest.  Ward v. Downtown Dev. Auth., 786 F.2d 1526, 1531 (11th Cir. 1986).

For the purposes of the instant Motion, the Sheriff assumes that the failure to provide Elizabeth with a health care assessment amounted to a deprivation of a protected property or liberty interest.  (Doc. # 73 at 21); Taylor, 818 F.2d at 799.  The Sheriff instead argues that Holder has failed to establish constitutionally-inadequate process.  (Id.

33

at 21-23).   The Court agrees.

"[P]rocedural due process violations do not become complete unless and until the state refuses to provide due process." McKinney, 20 F.3d at 1562 (internal quotation marks omitted).   In Parratt v. Taylor and Hudson v. Palmer, the Supreme Court clarified that the state is not always required to provide pre-deprivation process.   Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga., 633 F.3d 1297, 1317 (11th Cir. 2011) (citing Parratt v. Taylor, 451 U.S. 527 (1981) and Hudson v. Palmer, 468 U.S. 517 (1984)). Under the Parratt-Hudson doctrine, pre-deprivation process is not required when the challenged deprivation "is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure."   Nat'l Ass'n of Bds. of Pharmacy, 633 F.3d at 1317 (internal quotation marks omitted).

In such a case, "the State cannot predict precisely when the loss will occur" and it is therefore "difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place."   Parratt, 451 U.S. at 541.   Under these circumstances, the state is not required to provide pre-deprivation process if an adequate post-deprivation remedy exists.   Nat'l Ass'n of Bds. of Pharmacy, 633 F.3d at 1317.   A common-law tort lawsuit may constitute an adequate post-deprivation remedy.   Zinermon v. Burch, 494 U.S.

113, 128-29 (1990) ("Parratt and Hudson represent a special case of the general Mathews v. Eldridge analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide").

The instant case falls within the Parratt-Hudson doctrine. Holder alleges that "the only due process available to [Elizabeth] to protect her health and safety was the right to be medically assessed by a licensed health care provider within 72 hours of removal." (Doc. # 32 at ¶ 56). It is undisputed that the Sheriff had a standard operating procedure requiring such an assessment. (Id. at ¶ 51). Similar to Parratt, Holder alleges that Elizabeth was deprived of her right to that assessment by the unauthorized actions of the Sheriff's employees.[5] (Id. at ¶¶ 52-54).

Invoking the Parratt-Hudson line of cases, the Sheriff maintains that an adequate post-deprivation remedy exists: a tort lawsuit for damages. (Doc. # 73 at 22-23). In response, Holder identifies no feasible pre-deprivation procedure, and

---

[5] Although the Sheriff failed to perform the health care assessment in a substantial number of cases, that fact does not preclude a finding that the employees' acts were random and unauthorized. See Carcamo v. Miami-Dade County, 375 F.3d 1104, 1106 & n.4 (11th Cir. 2004) (explaining that under the Parratt-Hudson doctrine, "the acceptability of post-deprivation process turns on the feasibility of pre-deprivation process, not the existence of a policy or practice").

he fails to meaningfully explain how a state-law tort remedy would be an inadequate post-deprivation remedy.[6]

Holder does argue that "[a]ny process to remedy the deprivation of Elizabeth's denial of medical care would be futile since she would have been already deceased." (Doc. # 74 at 11). Holder cites no supporting legal authority, and the Eleventh Circuit has previously held that a tort remedy provides adequate post-deprivation process in wrongful death cases. E.g., Gilmere v. City of Atlanta, 737 F.2d 894, 908 (11th Cir. 1984) (holding that a survival action provided an adequate post-deprivation remedy), on rehearing en banc, 774 F.2d 1495 (11th Cir. 1985); Owens v. City of Atlanta, 780 F.2d 1564, 1567 (11th Cir. 1986) (holding that the plaintiff had not shown that remedies available under Florida law for negligence were inadequate to address a detainee's death while in custody); Powell v. Ga. Dep't of Human Res., 114 F.3d 1074, 1082 & n.11 (11th Cir. 1997) (noting that a tort lawsuit to recover for a child's death was an adequate post-deprivation remedy even if the state had sovereign immunity).

The Court does not suggest that any eventual award of

---

[6] The bulk of Holder's argument is a verbatim statement of his response in opposition to the Sheriff's most recent Motion to Dismiss (Doc. # 35). (See Doc. # 74 at 12-20; Doc. # 39 at 12-21). As a result, Holder's response is largely devoted to arguing that Elizabeth possessed a protected property or liberty interest, which the Sheriff does not currently dispute.

damages in a tort lawsuit could provide full compensation for the loss of Elizabeth's life.  However, in order to prevail on a procedural due process claim, Holder must demonstrate that Elizabeth was afforded constitutionally-inadequate process. Holder fails to make such a showing.  The Sheriff's Motion for Summary Judgment is therefore granted on Count II of the Second Amended Complaint. <u>Tinney v. Shores</u>, 77 F.3d 378, 382 (11th Cir. 1996).

### C. Wrongful Death

Holder's final claim is brought pursuant to Florida's Wrongful Death Act, Fla. Stat. §§ 768.19, <u>et</u> <u>seq</u>.  For the reasons explained above, the Sheriff is entitled to summary judgment on Holder's federal claims.  Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over this remaining state-law claim.  Resolution of the wrongful-death claim will require determinations of state law, and "[s]tate courts, not federal courts, should be the final arbiters of state law." <u>Baggett v. First Nat'l Bank of Gainesville</u>, 117 F.3d 1342, 1353 (11th Cir. 1997); <u>Raney v. Allstate Ins. Co.</u>, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").  The Court finds that principles of judicial economy, fairness, convenience, and comity weigh in

favor of having Holder's wrongful-death claim decided by a state court.  Baggett, 117 F.3d at 1353.

Accordingly, Count III of the Second Amended Complaint will be dismissed without prejudice.  Pursuant to 28 U.S.C. § 1367(d), the statute of limitations is tolled "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

## IV.  Conclusion

It is now **ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant's Motion for Summary Judgment (Doc. # 73) is **GRANTED IN PART** as to Counts I and II of the Second Amended Complaint (Doc. # 32).  The Motion is otherwise **DENIED.**

(2) The Court declines to exercise supplemental jurisdiction over Count III of the Second Amended Complaint, and that claim is therefore **DISMISSED WITHOUT PREJUDICE.**  The statute of limitations is tolled pursuant to 28 U.S.C. § 1367(d).

(3) The Clerk is directed to enter judgment in favor of Defendant as to Counts I and II, terminate any pending motions, and to **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 29th day of April, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

38